IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| NVR, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> DAVID NELSON, <br><br> *Defendant*. | Civil Action No. 1:16-cv-1328 |

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff NVR Inc.'s Motion for a Temporary Restraining Order. Dkt. No. 19.[1] Plaintiff asks this Court to enjoin Defendant David Nelson from working for Siminini Homes, Inc., a Charlotte-based home developer and construction company; or for any other company covered by a non-compete clause in Defendant's contract with Plaintiff. For the reasons discussed below, the Court orders that Motion is DENIED.

### I. Background

Plaintiff NVR, Inc. ("NVR") is a Virginia corporation in the business of selling and constructing homes. It operates under a variety of trade names including Ryan Homes and does business in 28 metropolitan areas in fourteen states including Charlotte, North Carolina. Plaintiff divided the Charlotte region into three Divisions covering the city and surrounding counties. Defendant David Nelson is a former employee of Ryan Homes who worked for Plaintiff as the Division Manager in the North Division of Charlotte from approximately January 1, 2014 until his termination on or about August 30, 2016. As the Division Manager, Defendant was

---

[1] For the reasons set forth below, the Motion has been analyzed as a Motion for Preliminary Injunction. To avoid confusion it shall be referred to hereafter as a Motion for Preliminary Injunction.

responsible for, among other things, sales functions, profits and losses, ongoing homebuilding efforts, and strategic-decisions about the policies and guidelines for Plaintiff's operations in the area. On or about August 24, 2016, Plaintiff informed Nelson that his employment with the Company was terminated due to performance deficiencies. On October 31, 2016, Defendant joined Simonini Homes, Inc. ("Simonini"). Simonini is also engaged in the homebuilding industry in the Charlotte area.[2]

During Defendant's tenure at NVR, he signed various compensation agreements: a stock option agreement on February 7, 2014; two more on May 27, 2014 (the "Equity Agreements"); and a Homebuilding Profit Center Manager EBIT Incentive Program Description and Participation Agreement (the "EBIT Agreement") (collectively "the Agreements"). The most recent EBIT Agreement was signed on May 6, 2016 but Plaintiff avers that Defendant received payments through the EBIT program in March of 2015 and 2016 presumably through earlier, unsubmitted, versions of the EBIT Agreement. The Agreements contain an identical non-compete provision which provides in relevant part that:

> During your Service and for a period of twelve (12) months after your service ends…you shall not anywhere in the Restricted Area (as defined below):… (b) render services to…any person or entity that competes with the Company or an Affiliate in the residential homebuilding, mortgage financing, or settlement services business where such services are competitive with any of the services you provided to the Company or to an Affiliate during the twenty-four (24) months prior to termination of your Service.

Dkt. No. 21, Exh. A at 6. The Agreements define the "Restricted Area" as:

> "those counties and other units of local government in which the Company engaged in residential homebuilding business activities, mortgage financing business activities, or settlement services business activities, as applicable (x) over which you had any management responsibility at any time during the twenty-four months prior to termination of your Service or (y) from which you received, as part of your work duties,

---

[2] The parties vigorously disagree whether Plaintiff and Simonini are competitors in the Charlotte area. For the reasons discussed below, this issue is moot and the Court will avoid confusion by forgoing any attempt to sort through the competing affidavits concerning this issue.

>Confidential Information regarding such business activity, at any time during the twenty-four months prior to termination of your Service.

*Id.*

Plaintiff filed a Complaint on October 20, 2016 alleging that Defendant misappropriated and converted Plaintiff's trade secrets and other information, and thereby breached his contract when he left Plaintiff's employment. Dkt. No. 1. The next day Plaintiff filed a motion for a preliminary injunction and temporary restraining order to prevent Defendant's use of the allegedly misappropriated information. Dkt. No. 4. The parties reached an agreement on how Defendant would handle the relevant information in his possession and the Court dismissed the motion pursuant to the parties' stipulation. Dkt. No. 16. On December 21, 2016, Plaintiff filed an amended complaint alleging that Defendant breached the non-compete provision in the Agreements by joining Simonini. Dkt. No. 18. Plaintiff contemporaneously filed a second motion for a temporary restraining order to enjoin Defendant's employment with Simonini. Dkt. No. 19. After conferring with the Plaintiff, the Court converted the motion to one for a preliminary injunction and scheduled it for a hearing. The parties fully briefed the matter and the Court heard arguments on January 5, 2017.

## II. Legal Standard

In order to succeed on a request for preliminary injunction, the movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "The purpose of a

preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted).

### III. Discussion

#### A. Likelihood of Success on the Merits

Plaintiff must first establish that it is likely to succeed on the merits of its breach of contract claim against Defendant. The elements of a breach of contract action under Virginia law are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004).

Plaintiff contends that Defendant breached the non-compete provisions in the Agreements. Defendant argues that the Agreements are invalid for lack of consideration so the non-compete provision is not binding. In the alternative, Defendant alleges that the non-compete provision in the Agreements is not reasonable. The Court considers these issues in turn.

##### *1. Consideration for the Agreements*

"Virginia contract law requires the standard elements of offer, acceptance, and consideration for the formation of a valid contract." *Hill v. Alstom Power, Inc.*, No. 3:13-CV-00496-JAG, 2013 WL 6408416, at *2 (E.D. Va. Dec. 6, 2013). Consideration exists where an employer makes a unilateral offer to an employee and the conditions of that unilateral offer are performed. *Jensen v. Int'l Bus. Machs. Corp.*, 454 F.3d 382, 387 (4th Cir. 2006) (citing *Nicely v. Bank of Va. Trust Co.*, 277 S.E.2d 209, 212 (Va. 1981)). Sufficient consideration does not exist when an employee is terminated before his rights under the unilateral contract vest. *Chapman v. Asbury Auto. Grp., Inc.*, No. 3:15CV679, 2016 WL 4706931, at *4 (E.D. Va. Sept. 7, 2016).

Defendant argues that the Agreements were not supported by consideration because he signed the Agreements after he began his employment and did not immediately receive any benefits or promise of continued employment. Rather the Agreements only offered future benefits which did not vest. Accordingly, Defendant believes the Agreements lacked consideration. Plaintiff counters that Defendant did receive the benefit of the EBIT Agreement in 2015 and 2016 and that the Equity Agreements conferred substantial profit value on the Defendant.

The Court finds that the EBIT Agreement was supported by consideration. Despite the unilateral nature of the offer, it was offered to Defendant as an incentive for increased performance and Defendant received the benefit of the arrangement. The Virginia Supreme Court's decision in *Dulany Foods Inc. v. Ayers* is instructive on this issue. 220 Va. 502 (1979). In *Dulany Foods*, an employer issued a memoranda providing for severance pay for employees who remained with the company in order to maintain a "loyal, and contented group of employees." 220 Va. at 508. The court regarded the severance payment memorandum as a unilateral contract conditioned on continued service with the company. *Id.* at 510. In finding that the pay program was a valid contract the court found that "it [was] reasonable to...attribute the good will of the employees" to the pay program. *Id.* at 508. Similarly, the EBIT Agreement has the stated objective of "improv[ing] productivity and to reward those...who generate profits efficiently...." Dkt. No. 10, at 1. The contract also bears numerous hallmarks of a formal contract including a choice of law provision and merger clause. *Id.* at 8-9. Most important, Plaintiff avers that Defendant received two payments under the EBIT Agreement, March 13, 2015 and March 13, 2016, totaling $12,557.28.[3] Taken as true, Defendant received the benefit of

---

[3] Defendant alleges that he was terminated before any of the options identified in the Equity Agreements could have or had vested, and before the December 31, 2016 date listed for awards in the EBIT Agreement.

5

Plaintiff's unilateral contract offer to improve productivity when he accepted the 2015 and 2016 payments. Accordingly, the EBIT Agreement was based on sufficient consideration.

Similarly, the Equity Agreements are supported by consideration. The Equity Agreements stated on their face that "adequate consideration has been exchanged between the Company and you and that you have considered and agreed to execute this agreement." Dkt. No. 7, Exh. E at 2, 12, 25. Furthermore, Defendant consented to be bound by the confidentiality, non-competition, non-recruitment, and non-solicitation restrictive covenants in the Equity Agreements in order to obtain the stock options. The Equity Agreements also afforded Defendant certain qualified termination rights with respect to his otherwise at-will employment. Specifically, the Equity Agreements provided that if Defendant is terminated due to a reduction in force, he is entitled to a pro-rata share of the stock options based on a calculation set forth in the agreement. *See, e.g., id.* at 3. In this respect, the case is distinguishable from *Olander v. Compass Bank*, relied upon by Defendant, where "the rights under the stock option agreement would disappear" when the employee was terminated. 363 F.3d, 560, 565 (5th Cir. 2004). While Defendant remained an employee at will, he received the right to the options, as well as a benefit under certain termination scenarios, in consideration for his continued employment and agreement to comply with the terms of the Equity Agreement, including the confidentiality provision. For these reasons, the Equity Agreements are supported by valuable consideration.

*2. Validity of Restrictive Covenants*

Because the Agreements were formed on the basis of bargained-for consideration, the Court must determine whether the restrictive covenants in the contracts are valid.

"[T]he validity of a restrictive covenant is a question of law resolved in light of the language and circumstances surrounding the specific covenant at issue." *Brainware, Inc. v.*

*Mahan*, 808 F. Supp. 2d 820, 826 (E.D. Va. 2011). Covenants that restrain trade are disfavored by Virginia courts and if they are too restrictive they may not be legally enforceable. *Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493 (2002). "As a restraint of trade, the covenant must be strictly construed and, if ambiguous, it must be construed in favor of the employee." *Motion Control Sys., Inc. v. East*, 262 Va. 33, 37 (2001). The validity of a non-compete agreement is determined using a three part test which the employer has the burden to meet. The employer must show "that the restraint [1] is no greater than necessary to protect a legitimate business interest, [2] is not unduly harsh or oppressive in curtailing an employee's ability to earn a livelihood, and [3] is reasonable in light of sound public policy." *Modern Env'ts*, 263 Va. at 494-95. In analyzing these "three interrelated factors" Virginia courts consider "the restriction in terms of function, geographic scope, and duration." *Simmons v. Miller*, 261 Va. 561, 581 (2001). While the Court is required to "assess these elements together rather than as distinct inquiries", in this case, detailed analysis is warranted with respect to the restriction on functions and the geographic scope of the agreement. *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 393 (2012) (quotation omitted). The parties do not dispute that the one-year duration of the non-compete provision is not unreasonable.

a. Restricted Functions

Virginia Courts have "assessed the function element of provisions that restrict competition by determining whether the prohibited activity is of the same type as that actually engaged in by the former employer." *Home Paramount Pest Control Companies, Inc. v. Shaffer*, 282 Va. 412, 416 (2011).

Plaintiff argues that the functions restricted by the non-compete provision are not overbroad because while it prohibits Defendant from engaging in certain enumerated business

activities with a competitor, it does not prohibit Defendant from working for a competitor in *any* capacity. Plaintiff also argues that it has a legitimate interest in the scope of the restrictions because Defendant was exposed to confidential information during his employment that could be used to adversely compete with Plaintiff in the restricted business activities. Defendant does not expressly challenge the restricted functions except as they relate to the geographic scope discussed below. Nevertheless, the Court considers whether the restricted functions are overbroad.

Virginia courts have struck down non-compete provisions as overbroad that prohibited a former employee from owning or working for any business similar to the type of business conducted by the former employer, where the type of business was defined too broadly. *See Motion Control Systems*, 262 Va. at 36-38 (finding a non-compete provision prohibiting employment in "design[ ], manufacture[ ], [sale] or distribut[ion of] motors, motor drives or motor controls" overbroad where the employer dealt only with specialized brushless motors.); *see also Home Paramount*, 282 Va. at 416-18 ("When a former employer seeks to prohibit its former employees from working for its competitors in any capacity, it must prove a legitimate business interest for doing so.").

By contrast, Virginia courts have upheld non-compete agreements when "the prohibited activity is of the same type as that actually engaged in by the former employer." *Home Paramount*, 282 Va. at 416. For example, in *Blue Ridge Anesthesia*, the Supreme Court of Virginia upheld a non-compete that provided as follows:

> Employee agrees that if his employment terminates for any cause after he has been employed for ninety (90) days, he will not, for a period of three years thereafter, open or be employed by or act on behalf of any competitor of Employer which renders the same or similar services as Employer, within any of the territories serviced by agent of Employer, expressly provided however, that

8

> this covenant does not preclude Employee from working in the medical industry in some role which would not compete with the business of Employer.

239 Va. 369, 370-71 (1990). The court found it significant that the clause did not prohibit the former employees, who sold medical equipment for a medical equipment company, "from working in *any* capacity for a medical equipment company, or from selling *any* type of medical equipment. They are only prohibited 'from working in the medical industry in some role which would . . . compete with the business of [the employer]." *Id.* at 373. The court noted that "the restriction does not prohibit the former employees from selling critical care and anesthesia equipment outside their respective former territories or from selling any other goods and medical equipment within their former territories." *Id.*

In addition, Virginia courts have acknowledged that access to "confidential information makes [a] covenant not to compete more reasonable." *Brainware*, 808 F. Supp. 2d at 826 (quoting *Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 738–39 (4th Cir. 1993) (vacated pursuant to settlement)); *see also Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 529 (E.D. Va. 2006) ("[Plaintiff] has a legitimate business interest in imposing a reasonable non-compete clause, namely that such a clause would be necessary to protect itself from losing potential work to competitors through employees who leave the company and then compete against [the Plaintiff] using the business sensitive knowledge and contacts they acquired as an employee.") (quotations and citations omitted).

The non-compete provision in this case does not overly restrict the types of activities in which Defendant may engage. First, the non-compete provision only applies to residential homebuilding, mortgage financing, or settlement services businesses. These are broad categories but the non-compete does not prohibit Defendant from engaging in *any* work for a homebuilding company. *See Blue Ridge Anesthesia*, 239 Va. at 373 ("the former employees are not forbidden

9

from working in any capacity for a medical equipment company, or from selling any type of medical equipment. They are only prohibited 'from working in the medical industry in some role which would ... compete with the business.'"). The non-compete provision in this case is also distinguishable from the one held invalid in *Motion Control Systems* because the broad employment categories in this case are limited to those over which Defendant had managerial responsibility, received confidential information, or provided services while employed by Plaintiff. *See Motion Control Systems*, 262 Va. at 36-38. Thus, even though the non-compete provision covers a broad range of activities, its restriction on functions is consistent with other provisions found valid by Virginia courts.

### b. Geographic Scope

Even though the functions restricted by the non-compete provision are not overbroad on their face, they must be viewed in conjunction with the provision's geographic scope. *See Preferred Sys. Sols., Inc.*, 284 Va. at 393 (quotation omitted).

The non-compete provision sets forth two tests for whether a region is a "Restricted Area" subject to the non-compete. Defendant does not object to the first limitation respecting counties or other units of local government over which Defendant had managerial responsibility.[4] However, Defendant contends that the second limitation concerning regions "from which you received, as part of your work duties, Confidential Information regarding such business activity, at any time during the twenty-four months prior to termination of your Service" is overbroad. Defendant argues that the language would prohibit Defendant from engaging in covered business activities in any county or local government unit where Plaintiff or

---

[4] This portion of the geographic scope is less extensive than the form upheld in *Blue Ridge Anesthesia*. In that case, the Supreme Court of Virginia upheld the non-compete provision where it applied to any "territories serviced by" the former employees. *Blue Ridge Anesthesia*, 239 Va. at 373. Here, the provision does not cover all areas which Defendant serviced but only those over which he had managerial responsibility. Accordingly its scope is not unreasonable.

10

one of its affiliates operates. Defendant offers conflicting estimates on the scope of Plaintiff's operations but the parties agree that Plaintiff operates in at least fourteen states as far west as Illinois. Plaintiff counters that nothing in the record suggests that Defendant was provided Confidential Information from any of Plaintiff's divisions outside of the Charlotte area. Thus, according to Plaintiff, Defendant is manufacturing a hypothetical overbreadth that is not supported by the facts.

Plaintiff's attempt to limit the scope of the contractual language based on information and belief about the information Defendant ultimately received as an employee is inappropriate. The Court is required to interpret the Agreements as written and not to narrow the meaning of the agreement based on parol evidence. *See Home Paramount*, 282 Va. at 418. Plaintiff broadly defined Confidential Information in the Agreements and in doing so, invited the Court to contemplate hypotheticals arising out of the terms. *See id.* ("Home Paramount invited the circuit court to contemplate such hypotheticals when it drafted a provision that prohibits former employees from working for competitors in any capacity."). These hypotheticals expose the indefiniteness of the provision's terms.

For example, Plaintiff's counsel, Mr. Miller, conceded the potential sweep of the confidential information provision during the motion hearing on January 13, 2017. Counsel acknowledged that Plaintiff was seeking an injunction as to all of Charlotte, even though Defendant only worked in one division of the city, because of the high likelihood that Defendant received information which would be applicable anywhere in that jurisdiction:

> MR. MILLER: Our reading of the agreement, I think the black and white of the agreement, suggests that he is free to work in Charlotte in any other industry that he can find a job. He is also free to leave Charlotte and ply his decade's worth of experience in this industry, including experience that he gained at NVR, to have a

> similarly lucrative job in another geography so long as he is not competing or working for a company that is competing head to head with us.
>
> THE COURT: But not [work] in any of those three counties in Charlotte, even though he only worked for the Northern District, if I call it a district.
>
> MR. MILLER: They call it the Charlotte North Division, Your Honor. Yeah, I do believe that the agreement is properly interpreted that way because he did receive confidential information with respect to the operations in Charlotte as a whole. And of course, it's only natural that a company that's building several hundred homes a year in one municipality is going to share information and cooperate across those divisions. And it would vitiate the agreement if Mr. Nelson could just cross the street and engage in activity that he wasn't permitted to engage in on NVR's side of the street.

Dkt. No. 34, 21:4-25.

Plaintiff's counsel conceded that some of the company's Confidential Information, including some vendor pricing, is determined by Plaintiff at its home office in Virginia and that Defendant was privy to "pricing information not just on land, but on every aspect of NVR's business". Dkt. No. 34, 21:4-11. Plaintiff's counsel also acknowledged that "if [Defendant] got a package in the mail from Chicago that described [Plaintiff's] building operations there, then, yeah, potentially he would be enjoined, and I think properly so." Dkt. No. 34, 37:14-17. The foregoing discussion illustrates that as part of his duties, Defendant was exposed to extensive Confidential Information, some of which was specific to the Charlotte area and some of which was set at a regional or national level. This Confidential Information could enable Defendant to compete unfairly with Plaintiff. To the extent that Defendant received Confidential Information with respect to a region, such as the Charlotte area, the non-compete would prohibit him from working there. Any regionally or nationally applicable Confidential Information could afford Defendant an unfair competitive advantage anywhere that Plaintiff operates. As a result, Defendant could be prevented from working in Chicago not only by a Chicago-specific set of

Confidential Information but also by the regionally or nationally applicable Confidential Information that he received as part of his duties.

That the non-compete only applies to areas *from which* Defendant received the Confidential Information only exacerbates the overbreadth of the provision. Plaintiff's unduly narrow metaphor of Defendant receiving a physical package of confidential information from Chicago is anachronistic and contradicted by the course of the litigation. This legal dispute arose out of Defendant's alleged misappropriation of Confidential Information consisting almost entirely of digital content. But the non-compete provision fails to define what it means for information to come *from* an area by electronic means. Would an email containing Confidential Information sent by one of Defendant's Chicago employees qualify as information sent *from* Chicago? Would the answer change if the Confidential Information was contained in an attachment to the email which was created by the home office in Virginia? What about an email to Defendant from a Charlotte employee forwarding information sent to her by Chicago employees?[5] Unlike the hypothetical proposition that an employee with a bachelor's degree in entemology would dramatically switch to a career in janitorial services, which the Supreme Court of Virginia nevertheless adopted in *Home Paramount*, the hypotheticals posed in this case are practical realities for employees in nearly any white collar industry. *See Home Paramount*, 282 Va. at 418. Even if the Court were privy to all of the Confidential Information which Defendant received, and from where the Information was sent, the Court would still be forced to grapple with these difficult questions of provenance in order to fairly enforce the non-compete. Defendant is in no better position to determine from where he received all of his Confidential

---

[5] Whether the source of the Confidential Information is affixed to the location from which correspondence is sent or the location where the confidential information was produced, further complications ensue.

13

Information. Accordingly, he cannot reasonably determine which areas are restricted by the non-compete provision and cannot comply with its terms.

These contract terms arose out of bonus and profit sharing form agreements drafted by the Plaintiff. The non-compete provision is not the product of negotiation. Any defect is attributable to Plaintiff's drafting decisions. The reasonable duration and restriction on functions cannot cure the ambiguity in the provision's geographic scope. *See Home Paramount*, 282 Va. at 419 ("the clear overbreadth of the function here cannot be saved by narrow tailoring of geographic scope and duration"). The ambiguity must be construed in favor of the employee. *Motion Control Systems*, 262 Va. at 36-37. Because the geographic scope in this case is indefinite, it is necessarily overbroad, and the non-compete provision is invalid. Since the non-compete provision is not valid, the Court need not consider whether Simonini is a competitor as defined by the Agreements or whether Plaintiff has suffered harm as a result of a breach.

### B. Likelihood that Plaintiff Will Suffer Irreparable Harm

Notwithstanding the invalidity of the Agreements, Plaintiff cannot show that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

"Irreparable harm must be 'neither remote nor speculative, but actual and imminent.'" *Northwest Federal Credit Union, v. SBC Finance, LLC*, 2016 WL 6276962, at *3 (E.D. Va. Oct. 27, 2016) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

Plaintiff contends that Defendant, through Simonini, could use the Confidential Information to steal projects, land opportunities, employees, subcontractors, potential customers; or consistently under-bid Plaintiff with respect to business opportunities.[6] During the January 13, 2017 hearing, Plaintiff specifically noted that the parties may use the same vendors, such as bricklayers and Defendant could use Confidential Information to "get in there and lock up the bricklayers that [Plaintiff] wants to use and deprive us of the ability to do that." Dkt. No. 34, at 9:4-10. Plaintiff also argues that Defendant could use Confidential Information to enable Simonini to unfairly compete with Plaintiff for employees. The parties agree that none of the current 35 Simonini employees (besides Defendant) worked for Plaintiff in the past. Still, Plaintiff notes that Simonini has hired away six project managers from Plaintiff "over the last several years." Dkt. *Id.* at 11:9-12. None of those employees were subject to non-compete agreements. *Id.* at 11:23-12:4. But Plaintiff contends that because Defendant knows the compensation history and performance history of Plaintiff's current employees in the region, "he is in a position to pick off [Plaintiff's] people at will". *Id.* at 12:10-18.

Defendant did not address these claims directly in its briefing. During the January 13, 2017 hearing, Defendant argued that any injuries caused by vendor unavailability or loss of employees are highly speculative and even if they were likely, would still be compensable at law.

The Court agrees with Defendant's argument. Plaintiff offers homebuilding services throughout Charlotte, the Southeastern United States, and elsewhere across the United States. Plaintiff's extensive geographic footprint must require the use of more than one, e.g., bricklayer

---

[6] In its briefs, Plaintiff also argued that Plaintiff and Simonini are direct competitors in the homebuilding and townhouse construction industries. The parties offer conflicting evidence regarding this competition. On the basis of the limited factual record, the Court does not find that the Plaintiff is likely to succeed on a claim that it directly competes with Simonini for the same land opportunities or customers. Accordingly, the Court focuses its analysis on the harm caused by the loss of vendors and employees as emphasized in the January 13, 2017 hearing.

vendor, for all of its developments nationwide.[7] If Plaintiff's preferred vendor is unavailable because Simonini has managed to so occupy the services of the vendor then Plaintiff can bring in one of its other preferred vendors who operate in the same region to complete the work or else wait until the vendor becomes available again for Paintiff's project. In the former case, damages would be the difference between the price needed to pay for Plaintiff's preferred vendor and the covering vendor. *See Manor v. Hindman*, 123 Va. 767 (1918) ("if he is compelled to pay a higher price for the substitute thus procured, he may recover as damages the difference between what he was to pay for the original article and what he is thus compelled to pay for the substitute."). In the latter case, the damages would be the cost of the delay in obtaining the vendor's services to complete the project.

Plaintiff's claims about the poaching of its current employees and competition for talent also do not amount to irreparable harm. Plaintiff concedes that it does not require its project managers to sign non-compete agreements. Therefore, Plaintiff's current project managers, like their former colleagues, are free to leave their employment with Plaintiff and join Simonini or any other homebuilder in the Charlotte area. The current employees are also free to share their salary and performance history with potential employers. Plaintiff cites no legal authority that the risk of losing at-will employees is an irreparable harm. Notwithstanding Defendant's possession of confidential information, Plaintiff has no legal right to retain its project managers or prevent them from leaving for competitors. Accordingly, Plaintiff would not suffer irreparable harm if the employees-at-will leave the company—even to join a competing business.

---

[7] Even if Plaintiff does rely on only one bricklayer vendor nationwide for all of its services, it is hard to imagine that Simonini, a significantly smaller developer only operating in the Charlotte market, could interfere with Plaintiff's nationwide vendor relationship.

16

<u>C. Balance of the Equities / Public Interest</u>

Because the Court finds that Plaintiff is not likely to succeed on the merits and has not showed that it is suffering, or will suffer, irreparable harm it need not address the third or fourth elements of the preliminary injunction test. *See Hair Club for Men, LLC v. Ehson*, 2016 WL 3636851, at *8 (E.D. Va. May 6, 2016).

### IV. Conclusion

For the reasons discussed above, the Court DENIES the Motion.

February 14, 2017
Alexandria, VA

/s/
Liam O'Grady
United States District Judge